**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| LEONARD ROWE, ROWE | : | |
| ENTERTAINMENT, INC., LEE KING, | : | |
| and LEE KING PRODUCTIONS, INC., | : | Civil Action File No. |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against - | : | **COMPLAINT** |
| | : | |
| GARY, WILLIAMS, PARENTI, | : | |
| WATSON & GARY, P.L.L.C., WILLIE | : | |
| E. GARY, SEKOU M. GARY, MARIA | : | |
| SPERANDO, and LORENZO WILLIAMS, | : | |
| | : | |
| Defendants. | : | |

_____

THE GRIFFITH FIRM
45 Broadway, Suite 2200
New York, New York   10006
(212) 363-3784
(212) 363-3790 (fax)
eg@thegriffithfirm.com

*Counsel for Plaintiffs Leonard Rowe,*
*Rowe Entertainment, Inc., Lee King,*
*and Lee King Productions, Inc.*

# TABLE OF CONTENTS

*Page*

NATURE OF ACTION ...................................................................1

THE PARTIES...............................................................................6

JURISDICTION AND VENUE .......................................................7

I.    THE CIVIL RIGHTS ACTION ...............................................8

    A.    Racial Discrimination in the Concert
        Promotion Business.....................................................8

    B.    Commencement of the Civil Rights Action .........................12

    C.    Retention of the Gary Lawyers ............................................14

    D.    The Request for Emails and William Morris-CAA's
        Motion for a Protective Order to Avoid Producing Them...................18

    E.    The Court-Ordered Email Discovery Protocol .....................20

    F.    Settlement with Clear Channel/White Concert Promoter
        Defendants.............................................................22

    G.    The Email Search Results ..................................................22

    H.    Rowe's Accidental Discovery of the E-Discovery
        Memorandum ...................................................................24

    I.    Gary Assures the Civil Rights Plaintiffs that the
        E-Discovery Memorandum Guarantees Success .................25

    J.    SNR Withdraws after Gary Insists that the Civil
        Rights Plaintiffs Reject a $20 Million Settlement .................26

    K.    The Gary Lawyers Fail to Defeat William Morris-
        CAA's Motions to Exclude Expert Testimony .....................30

i

*Page*

L.    The Civil Rights Action is Dismissed Because the
      Gary Lawyers Fail to Defeat William Morris-
      CAA's Motions for Summary Judgment ...............................31

II.    THE GARY LAWYERS' FRAUDULENT SCHEME
       TO CONCEAL THEIR MALPRACTICE ......................................37

       A.    Gary's Fraudulent Misrepresentations Regarding
             the E-Discovery Memorandum ...............................37

       B.    The Gary Lawyers Continue to Fraudulently Conceal
             their Malpractice After the Civil Rights Action is
             Dismissed ...............................42

III.   PLAINTIFFS' DUE DILIGENCY IN INVESTIGATING
       GARY'S FRAUDULENT MISREPRESENTATIONS .................................45

       A.    The Appeal of the Civil Rights Action .................................45

       B.    Rowe's Campaign to Bring Public Attention to Judge
             Patterson's Dismissal of the Civil Rights Action...................................48

       C.    Rowe Discovers Gary's Malpractice and Fraud ...................................51

IV.    PLAINTIFFS' FEDERAL RICO ACTION AGAINST THE
       GARY LAWYERS...................................63

V.     PLAINTIFFS' GEORGIA MALPRACTICE ACTION
       AGAINST THE GARY LAWYERS ...................................66

CLAIMS FOR RELIEF ...................................67

       FIRST CLAIM FOR RELIEF
       (Legal Malpractice – Breach of Contract) ...........................67

       SECOND CLAIM FOR RELIEF
       (Fraudulent Inducement)...................................71

*Page*

JURY DEMAND ........................................................................................................72

PRAYER FOR RELIEF ............................................................................................73

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————

|  |  |  |
|---|---|---|
| LEONARD ROWE, ROWE | : | |
| ENTERTAINMENT, INC., LEE KING, | : | |
| and LEE KING PRODUCTIONS, INC., | : | Civil Action File No. |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against - | : | **COMPLAINT** |
| | : | |
| GARY, WILLIAMS, PARENTI, | : | |
| WATSON & GARY, P.L.L.C., WILLIE | : | |
| E. GARY, SEKOU M. GARY, MARIA | : | |
| SPERANDO, and LORENZO WILLIAMS, | : | |
| | : | |
| Defendants. | : | |

——————————————————————

Plaintiffs LEONARD ROWE, ROWE ENTERTAINMENT, INC., LEE

KING, and LEE KING PRODUCTIONS, INC. allege as follows for their

complaint against defendants WILLIE E. GARY, SEKOU M. GARY, MARIA

SPERANDO, LORENZO WILLIAMS, and GARY, WILLIAMS, PARENTI,

WATSON & Gary, P.L.L.C. (the "Gary Lawyers"):

## NATURE OF ACTION

1.      This is a civil action for legal malpractice and fraud to recover damages

arising from the Gary Lawyers' malpractice representing Plaintiffs and other black

concert promotors in a civil action to redress, *inter alia*, violations of civil rights laws

committed by prominent talent/booking agencies and concert promoters controlled by

white persons, *Rowe Entertainment, Inc., et al. v. The William Morris Agency, Inc., et al.*, 98 Civ. 8272 (RPP) (S.D.N.Y.) (the "Civil Rights Action"). The former defendants in the Civil Rights Action included the two largest and most powerful talent/booking agencies in the entertainment industry, The William Morris Agency, Inc. and Creative Artists Agency, LLC (collectively, "William Morris-CAA").

2.     In particular, the Gary Lawyers allowed William Morris-CAA to withhold emails containing hundreds of racially derogatory terms even though a memorandum from the e-discovery firm retained by the Gary Lawyers to review William Morris-CAA's emails established that such emails exist (the "E-Discovery Memorandum"). Although the Gary Lawyers could have obtained the racially derogatory emails simply by directing their e-discovery firm to send the emails to them, they did not do so. On the contrary, the Gary Lawyers allowed the e-discovery firm to send the emails back to William Morris-CAA in violation of the court's e-discovery protocol. When William Morris-CAA filed motions for summary judgment, the Gary Lawyers could not introduce admissible evidence of the racially derogatory emails because they had never obtained the emails.

3.     Inexplicably, rather than obtain the racially derogatory emails, the Gary Lawyers submitted an altered version of the E-Discovery Memorandum in opposition to the summary judgment motions, even though that memorandum was

2

inadmissible. To compound their error, they filed the memorandum without any attempt to describe it or otherwise lay a foundation for its admission into evidence.

4.      Discovery in the Civil Rights Action also revealed a plethora of admissible evidence of race discrimination in addition to the racially derogatory emails.   Documents and deposition testimony, for example, established that William Morris-CAA barred black promoters from promoting any white performers and barred them from promoting black performers once black performers attain celebrity status. William Morris-CAA did so by excluding black promoters from the bidding process and/or by imposing more onerous contract requirements than were imposed on white promoters.

5.      Yet the Gary Lawyers failed to submit that evidence in admissible form. The Gary Lawyers also repeatedly failed to comply with court rules in opposing summary judgment. As a result, William Morris-CAA's motions for summary judgment were granted and the Civil Rights Action was dismissed on January 5, 2005. The Second Circuit affirmed the dismissal on December 31, 2005 and the Supreme Court denied a petition for certiorari on October 2, 2006.

6.      The dismissal of the Civil Rights Action was directly caused by the Gary Lawyer's malpractice, including their malpractice in failing to obtain the racially derogatory emails identified on the E-Discovery Memorandum. But for the

Gary Lawyer's inexplicable malpractice, the Civil Rights Action would have resulted in a landmark victory for civil rights in this country. Instead, the loss of the Civil Rights Action emboldened William Morris-CAA and other entertainment companies to continue racially derogatory practices in the music industry as well as the broader entertainment industry as a whole.

7.   The Gary Lawyers also fraudulently induced the Civil Rights Plaintiffs into rejecting a $20 million settlement offer from William Morris-CAA. In 2002, William Morris and CAA indicated that they would accept a $20 million offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure. Willie Gary urged the Civil Rights Plaintiffs not to make such an offer, falsely representing that the racially derogatory emails and the E-Discovery Memorandum itself constituted "smoking guns" that guaranteed a settlement or jury verdict of at least $1 billion.

8.   Yet Gary fraudulently omitted two critical facts: (i) he and the other Gary Lawyers never obtained the racially derogatory emails; and (ii) the E-Discovery Memorandum was inadmissible. Relying on these fraudulent misrepresentations and omissions, the Civil Rights Plaintiffs rejected William Morris-CAA's settlement overture and never made an offer of judgment.

9.   The Gary Lawyers' malpractice and fraud are especially mysterious because Willie Gary is one of the most successful African American trial lawyers in

4

the country. He describes himself as the "Giant Killer" because of his track record of winning multimillion dollar verdicts against some of the largest and most powerful companies in the world. Plaintiff Leonard Rowe retained Gary after seeing a television news program that chronicled Gary's rise from poverty in the Jim Crow-era South to become the country's most prominent lawyer committed to defending the rights of minorities. In light of Gary's background, experience, and reputation, the Civil Rights Plaintiffs placed their unqualified trust in him and his colleagues.

10.    The Gary Lawyers abused that trust by implementing a fraudulent scheme to conceal their malpractice, which prevented Plaintiffs from discovering it for years. Even before the Civil Rights Action was dismissed, the Gary Lawyers fraudulently concealed their failure to obtain the racially derogatory emails by falsely representing that both the E-Discovery Memorandum and the underlying emails were protected by an "attorneys-eyes-only" court order. The Gary Lawyers falsely represented that the court order prevented them from showing the E-Discovery Memorandum or the emails to the Civil Rights Plaintiffs. The Gary Lawyers also fraudulently concealed their repeated procedural and evidentiary errors in opposing the summary judgment motions.

11.    After the Civil Rights Action was dismissed, the Gary Lawyers continued their scheme to conceal their malpractice by falsely representing that the

5

presiding judge's decision dismissing the Civil Rights Action was filled with blatant errors of law and could only be explained by racism and possible corruption. The Civil Rights Plaintiffs, all of whom were African Americans with first-hand experience of overt and indirect racism, had no reason to doubt these representations, especially since they were being made by a prominent African American lawyer who knew the law and had extensive experience with white judges in federal court.

12.     In response to Gary's representations that the presiding judge dismissed the Civil Rights Action due to racism and possible corruption, Rowe embarked on a decade-long campaign to expose that racism and corruption. Despite Rowe's due diligence in investigating the reasons why the Civil Rights Action was dismissed, the Gary Lawyers' fraudulent misrepresentations and omissions debarred and delayed him and the other Civil Rights Plaintiffs from discovering the Gary Lawyers' malpractice and fraud until after January 24, 2014.

### THE PARTIES

13.     Plaintiff Leonard Rowe is a citizen of Georgia.

14.     Plaintiff Rowe Entertainment, Inc. is a Georgia corporation that maintains its place of business in Georgia.

15.     Plaintiff Lee King is a citizen of Mississippi.

6

16.     Plaintiff Lee King Productions, Inc. is a Mississippi corporation that maintains its principal place of business in Mississippi.

17.     Defendant Gary, Williams, Parenti, Watson & Gary, P.L.L.C. (the "Gary Law Firm") is a Florida professional limited liability company that maintains its principle place of business in Stuart, Florida and whose members are citizens of Florida.

18.     Defendant Willie E. Gary is a citizen of Florida and, at all times relevant to this action was one of two managing members of the Gary Law Firm.

19.     Defendant Sekou M. Gary is a citizen of Florida and, at all times relevant to this action, was a member of the Gary Law Firm.

20.     Defendant Maria Sperando is a citizen of Florida and, at all times relevant to this action, was a member of the Gary Law Firm.

21.     Defendant Lorenzo Williams is a citizen of Florida and, at all times relevant to this action was one of two managing members of the Gary Law Firm.

**JURISDICTION AND VENUE**

22.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

7

23.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## I.     THE CIVIL RIGHTS ACTION.

### A.     Racial Discrimination in the Concert Promotion Business.

24.     The modern concert promotion business traces its roots to the late 1960s and early 1970s when an explosion in popular music combined with technological advances in communication and transportation made it possible for musical artists to undertake a series of live performances over a period of weeks or months in cities throughout the country. Independent promoters began working with musical artists and their talent/booking agents to organize and manage these concert tours. Over the next decades, the concert business exploded into a multibillion dollar business.

25.     Leonard Rowe and the other Civil Rights Plaintiffs were among the few African Americans who entered the concert promotion business at its inception in the early to mid-1970s. By the mid-1990s, Rowe and other black promoters noticed that while they were making solid middle-class livings, their white counterparts who had entered the industry at about the same time had become wealthy from reaping profits generated by the expanding market for successful white and black musical performers.

8

26.     The black concert promoters asked themselves how this disparity had come about. They realized that they were never allowed to promote the tours of the most successful musical acts. In fact, they were never allowed to work on the tours of any white artists. While they made their living working with new or struggling black artists, once a black artist achieved a certain level of popularity, white promoters took over management of their concert tours. Rowe, for example, worked with black musical artists such as Michael Jackson, Prince, Whitney Houston, Janet Jackson, Lionel Richie, Patti Labelle, and Barry White when they were starting their careers.

27.     Once these black artists started to receive widespread public attention, however, they signed with white booking agencies and their concert tours were redirected to white promoters. As a result, Rowe and other black promoters are denied participating in the lucrative profits to be earned from promoting concert tours of even black performers when they achieve celebrity or superstar status. Ironically, because it is more difficult to fill venues for struggling black performers than performers who have already achieved celebrity status, black promoters face significantly greater challenges, and receive significantly less remuneration, than their white counterparts. The white promoters are given virtually exclusive rights to promote the most successful performers regardless of race.

9

28.     Rowe and the other black promoters realized that the artists themselves generally were not responsible for this denial of access. An artist's selection of a "talent" or "booking agent," however, is one of the most important factors in determining that artist's success. The largest and most successful booking agencies have the financial resources and contacts in the entertainment industry to either make or break promising musical artists who have attracted a loyal fan-base and favorable critical reviews. Thus, once a musical artist achieves enough success to attract the interest of one of the major booking agencies, that artist generally "signs" with a booking agency and henceforth relies on its booking agent to control most aspects of his or her career.

29.     The William Morris Agency was founded 116 years ago, in 1898, and has been one of the most dominant booking agencies throughout Hollywood's history. Its corporate culture was forged during the pre-civil rights era when overt racial discrimination and segregation was generally accepted. For most of its history, black musical artists were overtly denied opportunities provided to their white counterparts and there were no African Americans employed on the business side of the industry. Prior to 1961, William Morris had an explicit practice of not hiring African Americans as agents or executives. Although some African Americans were employed in lower level positions, they could not be promoted to be agents or higher level executives.

10

30.     Although most American popular music has traced its roots to African

American musicians since at least the 19th century, African American musicians were

historically excluded from the commercial music business. With the advent of mass-

produced musical records in the 1920s and 1930s, the all-white music industry took

advantage of a marketing opportunity by selling black performers' "race records" to

African Americans. William Morris and the all-white music industry seldom allowed

black recording artists to "cross-over" to a general audience. When pioneering black

musicians were creating the new genre of rock and roll in the 1950s, for example, the

music industry promoted white imitators to huge popular success while the original

black artists were relegated to marginal venues and markets. Not until the advent of

the 1960s civil rights movement did the music industry start to market some black

performers to the general public. While African American musicians have more

opportunities to "cross-over" into the mainstream today, they continue to be generally

excluded from the business side of the industry, with only a few token African

Americans employed as talent agents by booking agencies.

31.     Creative Artists Agency ("CAA") was formed in 1975 by five

William Morris talent agents and has grown to be one the largest and most

powerful booking agencies in the world. Continuing the cultural traditions of

William Morris, CAA talent agents have always consisted primarily of white men

11

and CAA has always operated within the same white-dominated culture, with vestiges of the overt racism from the pre-civil rights era, as William Morris.

32.     In 1996, Rowe and other black promoters formed the Black Promoters Association of America (the "BPA") for the purpose of rectifying the lack of access afforded to black promoters by William Morris-CAA. Rowe was elected President of the BPA and, for the next two years, the BPA under Rowe's leadership conducted a public relations and lobbying campaign to pressure William Morris-CAA into eliminating the color bar which denied black promoters equal access to contract with white musical acts and successful black musical acts.

**B.     Commencement of the Civil Rights Action.**

33.     By the summer of 1998, Rowe and the BPA had become discouraged with the lack of progress being made by their public relations and lobbying campaign. William Morris-CAA was still giving the most lucrative concert tours to white promoters and relegating black promoters to the tours of new or struggling black performers. Rowe discussed the possibility of a civil rights action against William Morris-CAA with a New York music lawyer, Robert Donnelly. Donnelly referred Rowe to Martin Gold, a prominent New York civil litigator with the firm Gold, Farrell & Marks ("GFM").

34.     In September 1998, Rowe met with Gold and other GFM lawyers.

12

Gold and his team conducted an independent investigation of the BPA's allegations of racial discrimination in the concert promotion business. They concluded that there was pervasive racial discrimination not only by William Morris-CAA but also by other booking agencies and the white concert promoters who conspired with agents from the booking agencies and benefited by their discriminatory practices. Gold's team also determined that the booking agents and white concert promoters were violating federal and state anti-trust laws by segmenting the market into exclusive geographic territories and excluding the black promoters from those territories. On or about October 1998, GFM entered into a contingency agreement with the Civil Rights Plaintiffs under which GFM would retain one-third of any recovery after deducting all expenses, which were to be paid from an escrow account funded by the Civil Rights Plaintiffs.

35.     On November 19, 1998, the complaint was filed commencing the Civil Rights Action. Gold told Rowe that the complaint's demand of $750 million represented a realistic damage award and that he expected the Civil Rights Action to result in fees to his firm in the amount of hundreds of millions of dollars.

36.     Although the initial complaint was dismissed without prejudice, the amended complaint survived William Morris-CAA's motions to dismiss. In July 1999, the Civil Rights Plaintiffs learned that GFM had been acquired by a larger

13

New York City firm, RubinBaum, and that both GFM and RubinBaum had institutional clients in the entertainment industry.

37.    Gold continued to be the partner in charge of the Civil Rights Action, working with a less senior RubinBaum partner, Ray Heslin, and a younger associate lawyer, Richard Primoff, who handled most day-to-day matters. Thereafter, the Civil Rights Plaintiffs noticed that Gold was no longer available.

38.    By the spring of 2001, the Civil Rights Plaintiffs were disappointed with the lack of progress. They became concerned that RubinBaum's ties to the entertainment industry might be preventing it from aggressively litigating a major racial discrimination case against some of the industry's most powerful players.

### C.    Retention of the Gary Lawyers.

39.    In April 2001, two events occurred that would alter the course of the Civil Rights Action. First, Rowe was in Los Angeles for a BPA-sponsored picket line in front of CAA's Beverly Hills offices in an attempt to attract public attention to CAA's discriminatory practices and the Civil Rights Action. A CAA employee approached Rowe and asked to meet later that day at a less conspicuous location. At that meeting, she told Rowe that racially derogatory language was commonplace within CAA's music division and that emails from the talent agents in that division often contained racially derogatory terms. She expressed support for the Civil Rights

14

Action and suggested that Rowe attempt to obtain the emails, although she refused to disclose her identity out of fear of reprisals from CAA.

40.    Second, when Rowe returned to his hotel at the end of the day, he watched an episode of the CBS television newsmagazine *60 minutes II*. One of the episode's segments profiled Willie Gary, describing him as the "Giant Killer" because of his string of hundred million dollar plus victories against major U.S. corporations. The show explained that Gary, the son of poor, black migrant workers, had achieved his success by fearlessly pursuing aggressive litigation strategies against the largest and most powerful corporations. Interviewed by CBS correspondent Morley Safer, Gary boasted, "It's war when we file those papers . . . No more nice guy – I'm in a fight and I can't stand to lose." Gary also explained that a recent jury award of $240 million against entertainment giant The Walt Disney Company had enabled him to create a "war chest" to finance several ongoing discrimination suits, including a major racial discrimination suit against Microsoft.

41.    When Rowe returned to Atlanta, he called RubinBaum lawyer Richard Primoff to report his conversation with the anonymous CAA-employee. Rowe expected Primoff to be excited about the information and to immediately agree to seek production of emails from William Morris-CAA and the other defendants. Primoff didn't want to focus on the emails, however, asserting that

15

doing so would be a costly waste of time. Rowe insisted on speaking with Heslin and Gold. To Rowe's surprise and disappointment, both Heslin and Gold agreed with Primoff that the emails should not be made a priority.

42.     Frustrated with RubinBaum's non-aggressive approach and potential conflict, Rowe decided that he and the other Civil Rights Plaintiffs needed an aggressive lawyer on their side who was as fearless as Willie Gary. Rowe learned that Gary was in Atlanta and he arranged a meeting at the state courthouse. Gary expressed interest in the Civil Rights Action and agreed that it was critical to obtain emails from William Morris-CAA and the other defendants. In subsequent calls and meetings, Gary explained that he needed New York co-counsel and that RubinBaum was the logical choice in light of its experience with the case. Gary assured Rowe, however, that he would be the primary trial lawyer and the other Gary Lawyers would make sure that the case was aggressively litigated at every stage.

43.     Gary subsequently negotiated directly with RubinBaum regarding the terms of the Gary Lawyers appearing in the Civil Rights Action. Gary presented to the Civil Rights Plaintiffs a revised retainer agreement, which was finalized and executed on or about June 19, 2001. Under that agreement, a copy of which is annexed hereto as Exhibit A, the total contingency fee was increased from 33-1/3% to 48%. In addition, at Gary's insistence, the contingency fee was no longer

16

calculated on the net recovery, after expenses had been deducted, but on the gross recovery, before expenses were deducted.

44.    Rowe objected to calculating fees on the gross recovery, but Gary insisted that it was a condition for his appearance in the case. Upon information and belief, Gary insisted that that fees be calculated on gross recovery because he intended to bill wildly extravagant and unnecessary expenses, such as $20,000 trips in his private airplane, and he knew that the RubinBaum lawyers would object to such expenses cutting into their fee.

45.    Even though fees were to be calculated on the gross recovery, the Civil Rights Plaintiffs continued to be responsible for 100% of expenses. Although the retainer agreement provided that Gary agreed to advance $1 million for expenses "at such times and in such amounts as in Gary's judgment shall be necessary and desirable," Gary never advanced any part of that $1 million.

46.    The retainer agreement also specified the division of responsibilities between the lawyers. The agreement expressly provided that the Gary Law Firm and RubinBaum would have joint responsibility for

> pre-trial discovery procedures, including document discovery and depositions:   . . . each devoting the necessary time to conduct discovery procedures. . . [although] RubinBaum will coordinate and take the lead in discovery procedures.

17

47.     Shortly after the agreement was executed, the Gary Law Firm issued a press release announcing that the "Giant Killer" was entering the Civil Rights Action on behalf of the Civil Rights Plaintiffs and that Gary had increased the demand for damages from $750 million to $3.5 billion. Gary told Rowe that he expected the Civil Rights Action to be his biggest victory.

48.     The Gary Lawyers subsequently appeared in the Civil Rights Action as counsel to the Civil Rights Plaintiffs. In particular, on July 24, 2001, Maria Sperando, a member of the New York bar, filed a Notice of Appearance; on August 1, 2001, Willie Gary and Lorenzo Williams filed motions for admission *pro hac vice*, which were granted on August 15, 2001; on January 27, 2003, Sekou M. Gary filed a motion for admission *pro hac vice*, which was granted on January 28, 2003.

### D.     The Request for Emails and William Morris-CAA's Motion for a Protective Order to Avoid Producing Them.

49.     Even before the Gary Law Firm was retained, Rowe insisted that the RubinBaum lawyers start demanding production of emails from William Morris-CAA and the other defendants. When Gary first appeared in the case, the parties were negotiating over those discovery demands. Gary recommended that the Civil Rights Plaintiffs retain an e-discovery firm, Electronic Evidence Discovery, Inc. ("EED"), as a consultant to assist obtaining the emails. Between July and October

18

2001, EED, the RubinBaum lawyers, and the Gary Lawyers conducted a series of meetings and telephone conferences with counsel for William Morris-CAA and other defendants in an attempt to agree upon a method to search for and produce relevant emails. The parties could not reach agreement, however, and in September 2001, William Morris-CAA and other defendants filed motions for a protective order to avoid producing the requested emails.

50.   Concerned that the RubinBaum lawyers would not aggressively oppose William Morris-CAA's efforts to avoid producing the emails, Rowe spoke to Willie Gary personally on several occasions in the fall and early winter of 2001 about the importance of obtaining the emails and defeating the defendants' motions. Rowe emphasized to Gary that the critical email mailboxes that had to be searched were those of agents in the music departments of William Morris-CAA and the other booking agency defendants. Rowe and the other Civil Rights Plaintiffs worked with those agents regularly and therefore knew their names and email addresses.

51.   Rowe gave Gary a list of William Morris-CAA agents who he believed were likely to write and receive racially derogatory emails. These agents were in the music division of either William Morris or CAA. Rowe pointed out that the CAA employee who contacted Rowe in Los Angeles had said that agents in CAA's music division routinely used racially derogatory terms in their emails.

19

52.     Gary assured Rowe that Gary was doing everything possible to obtain emails of the designated music division agents and that he was personally involved in opposing William Morris-CAA's motions seeking a protective order disallowing discovery of the emails. During these conversations, Gary told Rowe that the motions for a protective order were actually a positive development, because they confirmed what the anonymous CAA-employee had told Rowe -- that emails from the music agents would contain racially disparaging terms. Gary also told Rowe that William Morris-CAA could not afford to produce the emails because the emails would conclusively prove the race discrimination claim and irreparably damage William Morris-CAA's reputation and public image. Gary explained that if the court denied the motions for a protective order, which Gary expected, William Morris-CAA would have no choice but to settle for at least $1 billion.

**E.     The Court-Ordered Email Discovery Protocol.**

53.     On January 16, 2002, the Magistrate Judge assigned to oversee discovery in the Civil Rights Action, Hon. James C. Francis IV, issued a decision finding that the requested emails were relevant and discoverable but held that the Civil Rights Plaintiffs would have to bear the cost of conducting electronic searches of the defendants' emails. The decision sets forth the following "protocol" for finding and producing the requested emails (the "Email Discovery Protocol"):

20

(i)     The Civil Rights Plaintiffs designate an e-discovery expert to conduct the searches (the "E-Discovery Expert"), who will be bound by the court's confidentiality order.

(ii)    Defendants technical staff will assist the E-Discovery Expert obtain the "mirror image" of any hard drive containing emails as well as any back-up tapes.

(iii)   Counsel to the Civil Rights Plaintiffs will provide advance notice of the search procedures, including specific word searches, to defense counsel. Defendants may object.

(iv)    Once the search method has been established, the E-Discovery Expert will run the search and produce the resulting emails to counsel for the Civil Rights Plaintiffs on an "attorneys-eyes-only" basis.

(v)     Counsel for the Civil Rights Plaintiffs will review the resulting emails, select the emails they believe are material, and forward the material emails to defense counsel.

(vi)    Defense counsel will then review the selected emails and designate any privileged emails, which are then removed unless a dispute about the designation results in a finding that the email is not privileged. The fact that counsel for the Civil Rights Plaintiffs reviewed the emails does not constitute waiver of the privilege.

(vii)   If any defendant desires to conduct a privilege review before emails are produced to counsel for the Civil Rights Plaintiffs, it must review its hard drives and back-up tapes at its own expense, remove privileged emails and provide a privilege log and a redacted hard drive and tapes.

54.     The Civil Rights Plaintiffs objected to that portion of the Magistrate's decision shifting the cost of conducting the email search to them. On May 5, 2002,

the Judge assigned to the Civil Rights Action, Hon. Robert P. Patterson, denied

those objections and affirmed the Magistrate's January 16, 2002 decision.

**F.      Settlement with Clear Channel/White Promoter Defendants.**

55.     By early 2002, most of the white concert promoter defendants had

been acquired by Clear Channel Communications, Inc. ("Clear Channel"). At

Gary's urging, a mediation was conducted with Clear Channel in early 2002. The

mediation led to a settlement with Clear Channel in May 2002. Although Rowe

thought the settlement was too low, he agreed to it at Gary's urging. Gary said that

settling with Clear Channel would provide a "war chest" that would allow Gary

and his team to go after the "big fish," William Morris and CAA, for billions.

56.     On June 1, 2002, RubinBaum announced that it had merged with the

national law firm Sonnenschein Nath & Rosenthal ("SNR"), a large law firm with

major clients in the entertainment industry.

**G.      The Email Search Results.**

57.     After the Magistrate's cost-shifting decision was affirmed on May 5,

2002, the Civil Rights Plaintiffs designated EED as their E-Discovery Expert under

the court-ordered Email Discovery Protocol. SNR lawyer Primoff informed Rowe

that EED would charge a flat fee of $200,000 for the work required under the

22

Email Discovery Protocol. The Civil Rights Plaintiffs agreed to pay that fee by deducting it from their share of the Clear Channel settlement.

58.     Over the next five months, Rowe and the other Civil Rights Plaintiffs repeatedly inquired about the status of the email search. Gary personally told Rowe in phone conversations between May and October 2002 that the court-ordered Email Discovery Protocol was being followed and that Gary expected the results to produce the "smoking gun" evidence that would force William Morris-CAA and the other remaining defendants to capitulate. Gary also told Rowe that SNR Lawyers Heslin and Primoff were taking the lead with the email discovery because they were knowledgeable about the technical issues and they were located in New York, where William Morris-CAA's lawyers were also located.

59.     In October 2002, Primoff told Rowe that the email searches did not result in any relevant emails. Rowe was shocked by the news and he immediately called Gary. In contrast to Primoff's "I told you so" demeanor, Gary expressed surprise that the search had not yielded any relevant emails. Gary said that the SNR Lawyers had not even informed him that the email searches had been completed. Gary said he would make further inquiries and report back to Rowe, although he also stated that if Primoff's report was true, it appeared as if the $200,000 spent on EED had been a waste of money.

23

**H.      Rowe's Accidental Discovery of the E-Discovery Memorandum.**

60.      On October 15, 2002, Rowe traveled to New York for a meeting with the SNR Lawyers that had been scheduled prior to Rowe's call with Primoff. While Rowe was there, he met with Heslin to discuss the case and try to learn more about the email search results. During their meeting, Heslin received a phone call on another matter and turned around in his desk chair for a few minutes to complete the call. While Rowe waited, he saw the first page of a several page memorandum from EED was among the many papers on Heslin's desk. The subject of the memorandum was the Civil Rights Action and the first page appeared to summarize the number of times racially derogatory terms such as "nigger," "spook," "spade," and "coon," appeared in emails of William Morris-CAA employees.

61.      When Heslin finished his call, Rowe pointed to the memorandum (the "E-Discovery Memorandum") and asked about its reference to hundreds of racially derogatory terms. Visibly shaken, Heslin grabbed the memorandum and hid it from Rowe's view, shouting that Rowe was not supposed to know about the memorandum because it was "attorneys-eyes-only." Rowe demanded an explanation as to how Heslin could report that the email search yielded no results when the E-Discovery Memorandum's first page apparently indicated that the word "nigger" appeared

24

hundreds of times in William Morris-CAA emails. Heslin refused to engage in further discussion of the memorandum or other aspects of the email search results.

62.    Rowe left the SNR offices and called Gary. Gary said he had not seen the E-Discovery Memorandum and that none of the SNR Lawyers had disclosed its existence to him or the other Gary Lawyers. Rowe expressed concern that SNR might be part of a conspiracy to cover-up "smoking gun" email evidence of William Morris-CAA's discriminatory practices. Gary considered this possibility, but he explained that with SNR's acquisition of RubinBaum, the previous philosophical conflict had become much more severe. Gary speculated that Heslin's inaction on the E-Discovery Memorandum might reflect that conflict. Gary also speculated that the conflict might soon force SNR Lawyers to withdraw from the case.

**I.    Gary Assures the Civil Rights Plaintiffs that the E-Discovery Memorandum Guarantees Success.**

63.    The following day, October 16, 2002, Gary called Rowe to report that Heslin had faxed the E-Discovery Memorandum to Gary. Gary reported that the E-Discovery Memorandum was the "smoking gun" evidence that they had hoped the email search would find, although Gary said that he could not give Rowe or the other Civil Rights Plaintiffs a copy of the memorandum in light of the "attorneys-eyes-only" provision of the Email Discovery Protocol.

25

64.     Gary also represented that the $200,000 spent by the Civil Rights Plaintiffs to finance the email search was "money well spent" because the E-Discovery Memorandum guaranteed success, either through a large settlement after the defendants' motions for summary judgment were defeated or through an even larger jury verdict at trial. Gary also promised that notwithstanding Heslin's false report about the lack of email search results, he and the Gary Law Firm would make sure that the SNR Lawyers henceforth would give their full attention to representing the Civil Rights Plaintiffs without regard for any actual or philosophical conflict. That was precisely why Rowe and the other Civil Rights Plaintiffs had hired Gary and they felt reassured by his representations.

**J.     SNR Withdraws after Gary Insists that the Civil Rights Plaintiffs Reject a $20 Million Settlement.**

65.     Soon after Rowe's accidental discovery of the E-Discovery Memorandum, Heslin asked Rowe to travel to New York for a meeting to discuss an important development in the case. Heslin wouldn't disclose the development over the phone, but assured Rowe that it was important and that everything would be explained at the meeting. Rowe agreed.

66.     In November or early December 2002, Rowe and fellow Civil Rights Plaintiff Lee King traveled to New York for the meeting. They met with Heslin

and other SNR Lawyers, although neither Gold nor anyone from the Gary Law Firm was present. Heslin told Rowe and King that William Morris-CAA and the other remaining defendants had indicated they would accept an "Offer of Judgment" of $20 million. Heslin explained that an Offer of Judgment was a formal settlement demand filed with the Court that gave the defendants the absolute right to settle the case for the amount specified in the offer.

67.     Heslin told Rowe and King that William Morris-CAA asked for an Offer of Judgment because William Morris-CAA was unwilling to pay more than $20 million or to engage in protracted settlement negotiations. Heslin said that William Morris-CAA's lawyers had assured him that if the Civil Rights Plaintiffs made the Offer of Judgment, William Morris-CAA would accept it. Heslin and the other SNR Lawyers strongly recommended that the Civil Rights Plaintiffs make the Offer of Judgment, which would bring the Civil Rights Action to a close.

68.     Rowe asked what Gary thought about the proposed settlement. Heslin reported that Gary was not involved and had not been consulted about the settlement. Rowe excused himself from the meeting and called Gary in private from a hallway in the SNR office. Gary told Rowe that the SNR Lawyers' proposed $20 million was ludicrous because the E-Discovery Memorandum guaranteed that the case would survive summary judgment and would thereafter

27

either settle for around $1 billion or result in a jury verdict of up to $3.5 billion. Gary told Rowe to reject SNR's proposal and "get out of there fast!"

69.    Rowe told Gary that a $20 million settlement would be a life-altering settlement for the Civil Rights Plaintiffs and it was very difficult to reject such a settlement. Gary said that although a $20 million settlement would make Rowe and the other Civil Rights Plaintiffs "millionaires," that would only provide a temporary respite from financial pressures in today's economy. Gary said that the Civil Rights Plaintiffs stood to win at least 50 times that amount at trial and that they could win more than 150 times that amount. Gary said that the Civil Rights Plaintiffs would be fools to accept a few million dollars when they were virtually assured of becoming billionaires.

70.    Relying on Gary's representations, Rowe and King told Heslin and the other SNR Lawyers that the Civil Rights Plaintiffs had no interest in a $20 million settlement with the principal defendants, William Morris-CAA. Rowe and King returned to their homes in Georgia and Mississippi, respectively, and an Offer of Judgment was never made.

71.    Shortly thereafter, Heslin called Rowe to say that SNR had decided to withdraw from the case. Under the revised retainer agreement with the Gary Law Firm, SNR was responsible for opposing motions for summary judgment that

William Morris-CAA intended to file within a few weeks of Heslin's announcement. Rowe asked whether SNR's withdrawal immediately before the summary judgment motions would prejudice the Civil Rights Plaintiffs. Heslin said that the Gary Law Firm was fully capable of opposing the motions. Rowe agreed to discuss the issue with the other Civil Rights Plaintiffs and Gary.

72.    Gary told Rowe that he didn't need the SNR Lawyers and that their decision to withdraw was "good riddance," especially because they apparently had been working against the Civil Rights Plaintiffs' interests ever since SNR acquired RubinBaum. Gary assured Rowe not to be concerned about the summary judgment motions since the E-Discovery Memorandum, which Gary said SNR had tried to conceal, guaranteed that those motions would be denied.

73.    On December 19, 2002, Rowe and most of the other Civil Rights Plaintiffs signed written consents to SNR's withdrawal. The SNR Lawyers immediately stopped all work on the case and sent their case files to the Gary Law Firm. The court subsequently granted the SNR Lawyers' motion to withdraw. Thus, after December 19, 2002, the Gary Lawyers were exclusively responsible for all aspects of prosecuting the Civil Rights Action.

### K.   The Gary Lawyers Fail to Defeat William Morris-CAA's Motions to Exclude Expert Testimony.

74.    On December 31, 2002 William Morris-CAA moved to strike the expert report and proposed testimony of Dr. Joseph R. Feagin, the Civil Rights Plaintiffs' expert on race issues and sociology, who had concluded that William Morris-CAA underutilized the Civil Rights Plaintiffs as concert promoters due to racial discrimination. On February 25, 2003, William Morris-CAA moved to strike the report and proposed testimony of Dr. Gerald Jaynes, the Civil Rights Plaintiffs' expert on economics of racial discrimination.

75.    Upon information and belief, the Gary Lawyers made mistakes in opposition of these motions and failed to adequately defend the experts' reports and proposed testimony.

76.    On September 16, 2003, the court granted William Morris-CAA's motion to strike the expert report and proposed testimony of Dr. Jaynes. On October 3, 2003, the court granted William Morris-CAA's motion to strike the expert report and proposed testimony of Dr. Feagin.

77.    The Gary Lawyers did not tell the Civil Rights Plaintiffs that the court had stricken the expert reports. Rowe learned of the court's decision at a subsequent hearing at which Judge Patterson referred to the exclusion of the expert

30

testimony. Gary then told Rowe that the exclusion of the expert testimony wasn't

significant because Gary didn't need expert witnesses to defeat the motions for

summary judgment or to convince a jury to return a multi-billion dollar verdict.

Gary said that although experts were important for a normal case, this was an

extraordinary case in which experts were superfluous because the E-Discovery

Memorandum proved that William Morris-CAA tolerated a work environment

where the use of racially derogatory language was commonplace.

**L.    The Civil Rights Action is Dismissed Because the Gary
        Lawyers Fail to Defeat William Morris-CAA's Motions for
        Summary Judgment.**

78.    By early April 2003, William Morris-CAA and the other remaining

defendants filed motions for summary judgment. When a defendant files a motion

for summary judgment, the plaintiff has the burden of submitting admissible

evidence in support of the claims alleged in the complaint. If the evidence raises an

issue of fact, the motion must be denied and the disputed issue of fact will be

decided at trial. If plaintiffs fail to submit admissible evidence that raises an issue

of fact, however, the court has no choice but to grant the motion and dismiss the

plaintiffs' claims.

79.    Thus, it was incumbent on the Gary Lawyers to submit admissible

evidence to support the Civil Rights Plaintiffs' claims in opposition to William

Morris-CAA's motions for summary judgment. Local Rule 56.1 required the Gary Lawyers to submit statements of material facts identifying the admissible evidence supporting the Civil Rights Plaintiffs' claims. As such, the Rule 56.1 statements were the most critical aspect of the papers submitted in opposition to motions for summary judgment.

80.     Between late February and October 2003, the Gary Lawyers filed opposing summary judgment papers that did not comply with applicable court rules and failed to cite admissible evidence in support of the Civil Rights Plaintiffs' claims. Because Judge Patterson did not want to penalize the Civil Rights Plaintiffs for the Gary Lawyers' misconduct, he provided the Gary Lawyers with repeated opportunities to correct their errors by submitting revised documents.

81.     On June 3, 2003, for example, Judge Patterson issued orders stating that because the Gary Lawyers had failed to submit proper Rule 56.1 statements, the pending motions for summary judgment would be granted unless the Gary Lawyers filed proper statements within 10 days. Although the Gary Lawyers filed revised statements, those revised statements still did not comply with the applicable rules and still failed to cite the evidence that was admissible. William Morris-CAA and the other remaining defendants moved to strike the revised statements on those grounds.

32

82.     Although the Gary Lawyers prepared a set of exhibits purportedly consisting of admissible evidence in support of the Civil Rights Plaintiffs' claims, most of that evidence was either not admissible or did not adequately support the claims. The most glaring example was the Gary Lawyers' submission of an altered version of the E-Discovery Memorandum as Exhibit 31 to their opposition papers. Because they had failed to obtain the racially derogatory emails identified on that memorandum, they could not submit the emails, which would have been admissible.

83.     In addition, even a complete version of the E-Discovery Memorandum was inadmissible hearsay which the rules of evidence would preclude the court from considering. The Gary Lawyers nevertheless submitted an altered version of that memorandum with its critical first page and seventeenth page omitted.

84.     Notwithstanding Gary's representations that the E-Discovery Memorandum constituted a "smoking gun" that would doom William Morris-CAA's motions, the Gary Lawyers' opposition did not focus on the E-Discovery Memorandum. On the contrary, the only reference to that memorandum is in a single paragraph in the Gary Lawyers' opposing memorandum:

> Defendant booking agencies fail to address the raw, ugly, unvarnished racial animus uncovered during discovery. The racial epithet "nigger" was used 349 times in e-mails of employees of CAA and [William Morris]. Ex. 31.

33

*See* Plaintiffs' Memorandum of Law in Opposition to Booking Agency

Defendants' Joint Motion for Summary Judgment at 15.

85.     Because the altered version of the E-Discovery Memorandum

submitted as Exhibit 31 did not constitute admissible evidence that racially

derogatory emails existed, William Morris-CAA asserted proper evidentiary and

procedural objections to Exhibit 31 and to the unsupported allegation of

"unvarnished racial animus" in the Gary Lawyers' brief.

86.     Not only did the Gary Lawyers fail to submit evidence in admissible

form in opposition to the motions for summary judgment, they failed to file a

complete set of their opposition papers with the court before oral argument was

held on October 16, 17 and 20, 2003.

87.     At the October 2003 oral argument, Judge Patterson noted that even

though he had given the Gary Lawyers a second chance to submit Rule 56.1

statements that complied with the court rules, the Gary Lawyers had failed to do

so. On October 16, 2003, for example, Judge Patterson admonished Gary Lawyer

Maria Sperando about her failure to comply with court rules and to submit

admissible evidence in support of the Civil Rights Plaintiffs' claims:

> I know you say there is no bidding system but you're supposed to
> show me proof. I had to say that with Mr. Campbell and I have to
> say it now [to you]. *Dammit. Please adhere to the rules of the*

> *court*. You come up here from Florida and you think, I won't say
> you do, but I do get counsel that come from out of state sometime,
> they think that they cannot deal with the rules of the court because
> they will never be before the Court again.   Well, that doesn't
> play. You play right by the rules of this Court. . .
>
> [U]nless you cite me to the record [of admissible evidence],
> instead you just give me these bal[d] statements, I can't do it
> and I won't do it. *And you will lose the motion. So you better do
> it while you have the chance.*

*See* Transcript of October 16, 2003 hearing at 126:5-25 (emphasis added).

88.     A fundamental principle of the summary judgment procedure in federal

court is that where a defendant moves for summary judgment, the plaintiff bears the

burden of submitting admissible evidence to support the claims set forth in the

complaint. At the October 2003 oral argument, however, Sperando attempted to

defend her failure to submit admissible evidence by arguing that William Morris-

CAA, as the moving parties, had the burden of establishing that evidence does not

exist to support the claims. Clearly shocked by this fundamental error of law, Judge

Patterson explained the obligations of a plaintiff opposing a motion for summary

judgment as if he was teaching a first year law class:

> Judge Patterson:   You have an obligation as a lawyer to get the
> [admissible] evidence. That's what the three
> years you have supposed to have been doing
> [during discovery]. . . . Get the contracts and
> show that these people were signed by a
> white person and not by a black person.

35

Sperando:           In this case today, they are on a motion for
                    summary judgment. They [William Morris-
                    CAA] have the obligation to producing these
                    contracts. If in fact –

Judge Patterson:    *They don't have it until you raise it in a way
                    that makes it clear what you are saying . . .
                    It's your case, you're the plaintiffs.
                    Therefore you have to show that. You have
                    to show it. It's an allegation in your
                    complaint. You have to show it. . . . It's not
                    their obligation.*

Sperando:           If they are moving for summary judgment to
                    show there is no genuine issue of material
                    fact in dispute.

Judge Patterson:    *You have got it all turned around. You're
                    absolutely turned around. It is your
                    obligation to do it. . . . So you have to show
                    me that there is a dispute [based on
                    admissible evidence].*

*See* Transcript of October 16, 2003 hearing at 148:6 – 149:12 (emphasis added).

89.     Over eight months after oral argument, the Gary Lawyers still had not

filed their exhibits or a complete set of their opposition papers with the court. On

July 20, 2004, Judge Patterson ordered the Gary Lawyers to do so by the following

day, July 21, 2004. On July 24, 2004, the Gary Lawyers finally filed a complete set

of their opposition papers, including the exhibits that purportedly consisted of

admissible evidence in support of the Civil Rights Plaintiffs' claims.

36

90.     On January 5, 2005, Judge Patterson issued a decision granting the

motions for summary judgment in their entirety and dismissing the Civil Rights

Action with prejudice. In doing so, Judge Patterson also granted the motions to

strike the portions of the Gary Lawyers' Rule 56.1 statements that did not comply

with court rules. As a result, Judge Patterson did not take into consideration

substantial portions of the Rule 56.1 statements and exhibits submitted by the Gary

Lawyers, including the altered version of the E-Discovery Memorandum submitted

as Exhibit 31.

## II.     THE GARY LAWYERS' FRAUDULENT SCHEME
##          TO CONCEAL THEIR MALPRACTICE.

### A.     Gary's Fraudulent Misrepresentations Regarding the E-
###         Discovery Memorandum.

91.     After William Morris-CAA filed their motions for summary

judgment, Rowe insisted on traveling to the Gary Lawyer's office in Stuart, Florida

to help prepare the opposition papers. Rowe naturally expressed interest in how the

E-Discovery Memorandum and the underlying racially derogatory emails would be

used to oppose summary judgment.

92.     Willie Gary and the other Gary Lawyers told Rowe that he could not

see either the E-Discovery Memorandum or the underlying racially derogatory

emails in light of the "attorneys-eyes-only" protective order, but that he could

nevertheless rest assure that the E-Discovery Memorandum would be filed with the court under seal. At one point, Rowe saw the E-Discovery Memorandum with other exhibits being prepared in a conference room where he and Maria Sperando were working. Before Rowe could examine the E-Discovery Memorandum, however, Maria Sperando removed it from the conference room table and admonished Rowe that he was precluded from seeing it. Just as he was able to see the first page of the memorandum when he was in Ray Heslin's office in New York, however, Rowe saw that the version of the E-Discovery Memorandum in Gary's Florida office included the memorandum's first page.

93.    The Gary Lawyers also prohibited Rowe from seeing their summary judgment opposition papers. The Gary Lawyers represented that because the opposition papers discussed "attorneys-eyes-only" information, the protective order precluded Rowe from seeing them. The Gary Lawyers restricted Rowe's activities to reviewing thousands of pages of deposition transcripts for relevant testimony as well as reviewing thousands of pages of documents that the Gary Lawyers represented had not been designed "attorneys-eyes-only."

94.    Rowe and fellow Civil Rights Plaintiff Jesse Boseman attended and observed the oral argument conducted in October 2003. When Rowe asked Gary why the E-Discovery Memorandum was not discussed during the argument, Gary said that

38

Rowe and the other Civil Rights Plaintiffs had to trust their lawyers. Just as Gary wouldn't explain to Rowe how to promote a concert, Rowe had to let his lawyers prosecute the case in the manner that they knew best. Gary reminded Rowe that Gary was the "Giant Killer" and that he had been in these types of situations many times before. Gary also said that because the E-Discovery Memorandum was "attorneys-eyes-only," it could not be discussed during a public court hearing. Gary assured Rowe that notwithstanding Judge Patterson's critical comments at the hearing, everyone knew that the E-Discovery Memorandum and other "attorneys-eyes-only" evidence would defeat the motions for summary judgment.

95.     In fact, however, the Gary Lawyers knew that the E-Discovery Memorandum was not subject to the "attorneys-eyes-only" provision of the Email Discovery Protocol. Although that provision was designed to protect potentially confidential business information, nothing in the E-Discovery Memorandum constituted such confidential business information and the Email Discovery Protocol did not prevent the Civil Rights Plaintiffs from learning whether the email search had found racially derogatory terms. Accordingly, nothing prevented the Gary Lawyers from providing the Civil Rights Plaintiffs with a complete copy of the E-Discovery Memorandum. In addition, had the Gary Lawyers obtained the underlying emails, any racial slurs that they contained certainly would not

39

constitute "confidential business information" and the court would have granted an application to lift the "attorneys-eyes-only" provision as to such emails.

96.    Accordingly, the "attorneys-eyes-only" provision did not preclude the Gary Lawyers from discussing the E-Memorandum or the underlying racially derogatory emails at the October 2003 oral argument and the Gary Lawyers were well aware of that fact. The Gary Lawyers could not discuss the actual racially derogatory emails, however, because they had failed to obtain them from EED and they had failed to identify them as relevant documents to William Morris-CAA in accordance with the Email Discovery Protocol.

97.    Because a version of the E-Discovery Memorandum had been annexed as Exhibit 31 to the Gary Lawyers' opposition papers, Sperando and the other Gary Lawyers could have raised that memorandum at the October 2003 oral argument. Had they done so, however, Judge Patterson would have naturally asked why the underlying racially derogatory emails had not been submitted. Rowe would have then discovered that the Gary Lawyers had failed to obtain the emails and the E-Discovery Memorandum was neither admissible nor subject to the "attorneys-eyes-only" provision. Accordingly, the Gary Lawyers said nothing about Exhibit 31 and falsely told Rowe that the attorneys-eyes-only provision precluded them from mentioning Exhibit 31 at the oral argument.

40

98.     The Gary Lawyers concealed these facts from Rowe and the other Civil Rights Plaintiffs in order to prevent Rowe from learning of their malpractice and fraud. Knowing that the E-Discovery Memorandum was inadmissible and the underlying emails had never been obtained, Gary nevertheless repeatedly assured Rowe and the other Civil Rights Plaintiffs that "there was no chance" that the motions for summary judgment would be granted in light of the E-Discovery Memorandum. Gary made these representations with knowledge of their falsity in telephone calls and in-person meetings with Rowe and the other Civil Rights Plaintiffs during the entire summary judgment briefing process, from early 2003 through the oral argument conducted in October 2003.

99.     After the oral argument, the Gary Lawyers failed to comply with Judge Patterson's request that they re-file their opposition papers to comply with the court rules and the rules of evidence. During the months that followed, Rowe would periodically ask Gary what was taking so long for the court to decide the summary judgment motions. Gary did not disclose that the Gary Lawyers had still not submitted proper versions of their opposition papers. On the contrary, he told Rowe that there was "nothing to worry about" because "judges usually take a lot of time to decide summary judgment."

100.   The Gary Lawyers finally refiled the opposition papers on July 24, 2004, four days after Judge Patterson's July 20, 2004 Order directed them to file the papers by July 21, 2004. The Gary Lawyers did not disclose to the Civil Rights Plaintiffs (i) the Gary Lawyers' repeated inability to file papers that complied with the court rules and the rules of evidence; (ii) Judge Patterson's July 20, 2004 Order; or (iii) the fact that the papers were not finally filed until July 24, 2004 – over nine months after the oral argument. After July 24, 2004, Gary continued to respond to Rowe's inquiries by representing that Judge Patterson was not taking an unusually long time to decide the motions, "there was nothing to worry about," and that denial of the summary judgment motions was assured.

### B.   The Gary Lawyers Continue to Fraudulently Conceal their Malpractice After the Civil Rights Action is Dismissed.

101.   After Judge Patterson's summary judgment decision was issued, Gary called Rowe to break the news. Gary said, "Rowe, that judge up there in New York, he's as racist as can be – he throwed everything out." Rowe asked how that could be in light of the E-Discovery Memorandum and the other evidence proving the Civil Rights Plaintiffs' claims. Gary responded, "I don't know what that judge was thinking, he's a racist and there was no way we were going to win no matter what evidence was submitted." Rowe naturally responded that the decision had to

42

be appealed, but Gary said, "Nah, there's no way we're going to win up there against those racists in New York – you'll have to find yourself another lawyer if you want to appeal."

102.   Judge Patterson's summary judgment decision is over 100 pages long. Footnote 143 of Judge Patterson's summary judgment decision adopts William Morris-CAA's objections to Exhibit 31 and concludes "the Court is disregarding Exhibit 31 in its entirety as irrelevant material." After Rowe had read the opinion, he called Gary again to ask about the E-Discovery Memorandum. Gary said that the E-Discovery Memorandum was both admissible and highly relevant and that the only explanation for Judge Patterson's refusal to consider it was racism. Gary stated that Judge Patterson's decision was clearly wrong because summary judgment is never appropriate whenever there is a "scintilla" of evidence and the E-Discovery Memorandum was nothing less than conclusive evidence. Gary accused Judge Patterson of racism, representing that no reasonable judge would ignore the E-Discovery Memorandum and/or the other evidence presented in opposition to summary judgment.

103.   Gary also told Rowe and the other Civil Rights Plaintiffs that Gold, Heslin and the other SNR Lawyers were guilty of misconduct and that William Morris-CAA would "stop at nothing" to defeat a lawsuit like the Civil Rights

43

Action. Although Gary said he had prevailed against powerful companies before,

he could do nothing against a corrupt and racist judicial system. Gary speculated

over whether the SNR Lawyers and Judge Patterson were involved in a conspiracy

with counsel for William Morris-CAA. Citing his fears of corruption and ingrained

racial bias in the New York federal courts, Gary refused to reconsider his decision

not to appeal.

104.   Rowe and the other Civil Rights Plaintiffs found Gary's

representations that the Civil Rights Action was dismissed due to a corrupt and

racist judicial system credible. They had grown up during the Jim Crow era in the

South and had first-hand experience with overt racism and a corrupt judicial

system that regularly denied justice to African Americans. In their concert

promotion business, each of the Civil Rights Plaintiffs also had first-hand

experience with white people who pretended to be polite and treat African

Americans with respect, but nevertheless held deeply embedded feelings of white

superiority. Thus, attributing the loss of the Civil Rights Action to Judge

Patterson's concealed racism and corruption in the New York judicial system was

inherently credible to the Civil Rights Plaintiffs.

105.   Moreover, the Civil Rights Plaintiffs held Gary in the highest possible

esteem. Gary was not only the most successful trial attorney in the United States,

44

he was an African American who grew up in poverty in the segregated and racist South. Gary not only knew about racism and judicial corruption, he had practiced in state and federal courts all over the United States. When Gary attributed the loss of the Civil Rights Action to racism and a corrupt judicial system, the Civil Rights Plaintiffs believed him. Indeed, based on their background and experience, they had no reason to question Gary's representations as to why Judge Patterson had granted the motions for summary judgment.

106.   The other Gary Lawyers were aware of Gary's fraudulent misrepresentation that the Civil Rights Action was dismissed due to Judge Patterson's racism and the racist and corrupt nature of the New York federal courts. Gary made those fraudulent misrepresentations on behalf of the other Gary Lawyers, with their consent and approval, in order to conceal their malpractice from the Civil Rights Plaintiffs.

### III.   PLAINTIFFS' DUE DILIGENCE IN INVESTIGATING GARY'S FRAUDULENT MISREPRESENTATIONS.

#### A.   The Appeal of the Civil Rights Action.

107.   Although the Civil Rights Plaintiffs accepted Gary's representations, they did not simply rely on them and take no further action to investigate the reasons why the Civil Rights Action was dismissed. On the contrary, Rowe

embarked on a decade-long investigation into Judge Patterson's dismissal of the Civil Rights Action.

108.   First, notwithstanding Gary's representation that an appeal would be futile, Rowe did not blindly accept Gary's representation that the New York appellate court was also racist and corrupt. On the contrary, Rowe tested those representations by doing something most reasonable people in his position would have done – he retained one of the world's premier law firms to prosecute an appeal of the Civil Rights Action. Rowe paid $230,000 to Keila Ravelo, a Partner in the prestigious international law firm of Clifford Chance, to appeal Judge Patterson's summary judgment decision. When that appeal was denied, Rowe authorized Ravelo to move for rehearing and rehearing en banc. When those motions were denied, Rowe authorized Ravelo to file a petition for certiorari with the Supreme Court, which was denied on October 2, 2006.

109.   During the almost two-year course of the appeal, Ravelo reviewed the entire record of the Civil Rights Action and filed an 18-volume appellate appendix. Ravelo never advised Rowe, however, that the record indicated that Gary had engaged in malpractice or any other improper conduct. A reasonable person who retains one of the world's premier law firms to prosecute an appeal certainly would expect that firm to report any negligence or other improper conduct on the part of

46

the trial attorney. Yet after charging Rowe tens of thousands of dollars to carefully review the entire record in the Civil Rights Action, Ravelo did not raise any questions regarding either the E-Discovery Memorandum, the altered version of that memorandum filed as Exhibit 31, footnote 143 of Judge Patterson's summary judgment decision, or any other aspect of the Gary Lawyers' prosecution of the Civil Rights Action.

110.   Ravelo's failure to advise Rowe that footnote 143 of Judge Patterson's summary judgment decision raised serious issues regarding Gary's conduct establishes that the footnote was not a "storm warning" that could put a reasonable person on notice of the Gary Lawyers' negligence. Indeed, if an experienced partner in an internationally respected law firm did not consider the footnote to raise questions about Gary's competence, certainly an ordinary layperson could not be expected to interpret the footnote as raising such questions.

111.   In addition, although Gary refused to participate directly in the appeal, he insisted on being part of a revised retainer agreement with Ravelo. That retainer agreement (i) divided the contingency fee among Gary, Ravelo, and the other lawyers who had represented the Civil Rights Plaintiffs; and (ii) provided that Gary would continue as trial counsel for the Civil Rights Plaintiffs if the appeal succeeded. Gary negotiated that retainer agreement directly with Ravelo and

47

thereafter cooperated with her by providing documents and other information about the Civil Rights Action. Gary continued to represent the Civil Rights Plaintiffs in that capacity through October 2, 2006, the date on which the Supreme Court denied Ravelo's petition for certiorari.

### B.   Rowe's Campaign to Bring Public Attention to Judge Patterson's Dismissal of the Civil Rights Action.

112.   Rowe and the other Civil Rights Plaintiffs considered the appeal's failure as confirmation of Gary's representations that the appeal was futile due to Judge Patterson's racism and the racist and corrupt nature of the New York federal courts. Within a few months of the Supreme Court's denial of Ravelo's petition for certiorari, Rowe began a multi-year campaign to investigate and expose the reasons why the Civil Rights Action was dismissed.

113.   Relying on Gary's misrepresentations, Rowe naturally focused his efforts on investigating and exposing Judge Patterson's racism and the possible corruption between him and the New York lawyers on both sides of the Civil Rights Action. Through his misrepresentations regarding racism and corruption in the New York federal courts, Gary intentionally and fraudulently misdirected Rowe's efforts in a manner intended to prevent Rowe from discovering the Gary Lawyers' malpractice, which was the real reason that the Civil Rights Action was dismissed.

48

114.   On January 26, 2007, for example, Rowe wrote to Judge Patterson advising, *inter alia*, that after the Civil Rights Action was dismissed, Rowe and other black concert promoters could not get any work. The letter also attributed the ruling to Judge Patterson's racism and asserted that "the smell of corruption grows stronger and stronger."

115.   On February 7, 2007, Rowe faxed letters to various U.S. Congressmen and Senators seeking their assistance in correcting the injustice that had transpired in the Civil Rights Action and asking them to "lend your strong hand so that this injustice will not be swept under the rug." Among the elected officials who received faxed letters on February 7, 2007, were Congressmen Ron Paul, John Lewis, and Congresswomen Maxine Waters. Senators that received faxed letters from Rowe included Joe Biden, Hillary Clinton, Barack Obama, John Kerry and Chuck Schumer.

116.   Between 2007 and 2015, Rowe met with dozens of lawyers in an effort to enlist them to investigate and bring to light evidence documenting the reasons that the Civil Rights Action was dismissed. Rowe extensively described to those lawyers what Rowe considered to be the relevant procedural history of the Civil Rights Action, including the E-Discovery Memorandum. Not one of those lawyers ever suggested that Gary may have been negligent.

49

117.   Between 2007 and 2015, Rowe appeared on a variety of radio and TV talk shows, including the Geraldo Rivera Show, the Roseanne Barr Show, Larry King Live, Good Morning America, the Early Show and others to discuss the Civil Rights Action and his view that its dismissal was due to racism and corruption.

118.   After the 2009 death of Rowe's close friend Michael Jackson, Rowe published a book about Jackson's death and racial discrimination in the entertainment business, *What Really Happened to Michael Jackson*. The book includes a description of the Civil Rights Action. In the final chapter, Rowe parrots Gary's assertion that Judge Patterson was a racist and possibly involved in a corrupt conspiracy with the white lawyers:

> Judge Robert Patterson was a person I had grown to respect during the years of this litigation. I can honestly say that I had agreed with practically all of his motion rulings that had taken place over the past five plus years, even when he ruled against us. I could always understand his reasoning behind his ruling. I had come to have enormous respect for this judge. I started to believe that Almighty God had chosen this judge for us, and for some strange reason I still do.
>
> I deeply feel that we were betrayed by this judge, the Honorable Robert P. Patterson. He swore under oath to protect and defend the constitution of the laws of the United States of America. When I last checked, the law made no exceptions to this requirement. *He clearly did not obey the law. I truly believe that the massive amount of money that was at stake here, as well as the illegal way of doing business in the concert promotion industry, played a significant role in his decision. I also believe*

50

*that all of this and whatever else was needed caused this judge to turn a blind eye and a deaf ear to the evidence, and take away our basic right as citizens to have a jury hear our case. I also believe that our race also played a significant role in his decision making. This was corruption at its highest level.*

Rowe, L., *What Really Happened to Michael Jackson* (2010) at 112-13.

119.   Rowe wrote this book with the hope of bringing awareness to the injustices that had devastated and destroyed the lives of not only black concert promoters, but African Americans and thousands of other Americans who depended on the entertainment industry for their livelihood. He hoped the book would bring public pressure to investigate the racism and corruption that Rowe believed was responsible for the loss of the Civil Rights Action.

120.   Rowe provided the Gary firm with a copy of his book shortly after it was published in January 2010. Neither Gary nor any of his colleagues contacted Rowe to take issue with the book's statements about Judge Patterson. In light of his fiduciary relationship with Rowe, Gary's silence constitutes an independent instance of fraudulent concealment as well as a ratification of his prior affirmative misrepresentations.

### C.   Rowe Discovers Gary's Malpractice and Fraud.

121.   In 2009, Rowe was approached by a freelance journalist, Robert Parker, who had heard Rowe on one of the radio and TV talk shows on which he

was interviewed about the Civil Rights Action. Parker was investigating corruption

in the federal judicial system for a possible article and he thought the Civil Rights

Action might be an example of such corruption. Over the next couple of years,

Parker and Rowe had several telephone and in-person meetings at which they

discussed the Civil Rights Action and other potential instances of corruption in the

courts. Parker published a CNN iReport web article about the Civil Rights Action

in December 2011.

122.   Shortly after he met Rowe, Parker encouraged Rowe to file a complaint

against the SNR Lawyers with the New York bar. In April of 2010, Rowe filed such

a complaint with the Departmental Disciplinary Committee ("DDC") in New York,

accusing SNR attorneys Martin R. Gold and Raymond Heslin of violating numerous

ethical rules under the New York Rules of Professional Conduct and not providing

Rowe with their case files in the Civil Rights Action.

123.   The DDC dismissed Rowe's complaint on July 29, 2010. At no time

during the DDC's investigation and consideration of Rowe's complaint did anyone

at the DDC indicate to Rowe that the Gary Lawyers may have been negligent in

their prosecution of the Civil Rights Action. Upon information and belief,

however, the DDC's investigation led two New York lawyers to review the court

file of the Civil Rights Action some time during 2010. In December 2011 or

52

January 2012, a DDC staff person called Rowe and informed him that two New York lawyers who had reviewed the court file wanted to meet with Rowe.

124.   On February 7, 2012, Rowe and Parker flew to LaGuardia airport in New York City, where they met with these two lawyers for several hours at the Ramada hotel. At that meeting, the lawyers told Rowe for the first time that the E-Discovery Memorandum was inadmissible and that Judge Patterson had no choice but to disregard it in ruling on the motion for summary judgment. They also told Rowe that all of his lawyers in the Civil Rights Case, including the Gary Lawyers, must have been aware that the E-Discovery Memorandum was inadmissible at all times. They said that any competent lawyer would have immediately demanded production of the emails identified in the E-Discovery Memorandum because only those emails would constitute admissible evidence of the use of racial derogatory terms by William Morris-CAA employees.

125.   Rowe was simultaneously shocked by, and skeptical of, these assertions. Rowe refused to believe that Gary and his colleagues would not have done everything in their power to obtain admissible evidence of the derogatory emails. Rowe tried to call Gary to discuss the allegations but Gary did not return his phone messages.

126.   Even so, Rowe could not believe that the "Giant Killer," an African

American trial lawyer who had won hundred million dollar verdicts against the world's most powerful corporations, would intentionally betray African American clients prosecuting a potentially landmark civil rights lawsuit against pervasive racism in the music industry. Rowe found that Gary's explanations for the loss of the Civil Rights Action, that Judge Patterson was a racist and/or that the SNR Lawyers conspired with counsel for William Morris-CAA, more credible.

127.    Still relying on Gary's representations, Rowe filed a Rule 60(b) motion seeking to reopen the Civil Rights Action on March 2, 2012, approximately three weeks after Rowe met with the two New York lawyers. That motion, which Rowe filed pro se, without representation by counsel, alleged that the E-Discovery Memorandum constituted "new evidence" indicating that the SNR Lawyers conspired with counsel for William Morris-CAA to hide the racially derogatory emails identified in that memorandum. The motion was ultimately denied on the ground that an altered version of the E-Discovery Memorandum had been filed as Exhibit 31 to Gary's summary judgment opposition papers and therefore could not be considered new evidence.

128.    By mid-April, 2012, Gary had still not responded to Rowe's telephone messages. Rowe called Gary's office and asked to speak to one of the other lawyers who had worked on his case. Rowe was then transferred to Sekou Gary,

Willie Gary's son who had also worked on the Civil Rights Action. Sekou apologized for his father's failure to respond, asserting that his father had been very busy on other cases.

129.   During that telephone conversation, Rowe told Sekou about the assertion made by the two New York lawyers with whom Rowe and Parker met on February 7, 2012, that all of Rowe's lawyers, including the Gary Lawyers, must have known that the E-Discovery Memorandum was inadmissible. Sekou immediately dismissed that assertion, stating that Rowe "should know better" than to believe the Gary Lawyers would be wrong about such an important fact. Like his father had done previously, Sekou blamed Judge Patterson's racism for the loss of the Civil Rights Action and speculated that Judge Patterson, the SNR Lawyers, and counsel for William Morris-CAA entered into a corrupt conspiracy to assure that the Civil Rights Action would be dismissed.

130.   Rowe found Sekou Gary's representations credible and believed them. Rowe asked Sekou if he had read his book. When Sekou said that he didn't know that Rowe had written a book, Rowe offered to send him a copy. Rowe sent a copy of his book directly to Sekou Gary in late April or early May 2012.

131.   Based on Sekou Gary's representations, Rowe continued to believe that Judge Patterson, the SNR Lawyers and counsel for William-Morris engaged in

55

a corrupt conspiracy to assure that the Civil Rights Action would be dismissed. Rowe continued to make those allegations through his Rule 60 motion before Judge Patterson and to the media whenever Rowe had an opportunity to do so.

132.   In June 2012, Rowe was contacted by Marcus Washington, a former William Morris talent agent trainee prosecuting a racial discrimination employment arbitration. Washington had reviewed the court file of the Civil Rights Action for evidence in support of his employment discrimination claim and he had retrieved a copy of Exhibit 31, the altered version of the E-Discovery Memorandum filed by the Gary Lawyers. Washington found this copy of Exhibit 31 in the court file on May 15, 2012, Affidavit of Marcus Washington sworn to on December 5, 2013 [Doc. 879 in the Civil Rights Action] at ¶ 24, and provided Rowe with a copy shortly thereafter. A copy of that document is annexed hereto as Exhibit B.

133.   When Rowe reviewed Exhibit 31 in late May 2012, he learned several facts for the first time. First, the version of the E-Discovery Memorandum in the court file was missing the first and seventeenth pages. Second, the names of the William Morris-CAA agents listed on the Exhibit 31 did not include any of the agents in the music departments that Rowe had insisted must be searched for derogatory emails. On the contrary, although Exhibit 31 listed scores of William Morris-CAA employees, Rowe did not recognize any of them as music department

56

agents or employees. Third, the Gary Lawyers' representations that the E-Discovery Memorandum had been filed under seal and could not be obtained from the court file appeared to be false.

134.   These facts led Rowe for the first time to consider that the two New York lawyers with whom he had met on February 2012 may have been correct in accusing the Gary Lawyers of malpractice and fraud in their representation of the Civil Rights Plaintiffs in the Civil Rights Action. Nevertheless, Rowe still could not believe that the Gary Lawyers were responsible. Shortly after Rowe received a copy of Exhibit 31 from Washington in late May 2012, Sekou Gary called Rowe to confirm that he had received, and read, Rowe's book. Rowe asked Sekou about Exhibit 31's missing pages and how Washington could obtain a copy if it was filed under seal. Sekou asserted that the entire E-Discovery Memorandum without any missing pages was filed under seal. Sekou speculated that the missing pages were probably removed as part of the corrupt conspiracy involving Judge Patterson, the SNR Lawyers, and counsel for William Morris-CAA. He said that he didn't know how Washington was able to obtain a document that was filed under seal, but he speculated that it was due to a court error or that court procedures dictated that sealed documents would be unsealed after a certain period of time.

135.   In late May 2012, Rowe submitted filed Exhibit 31 in support of his

Rule 60 motion accusing the SNR Lawyers of fraud upon the court and corrupt conspiracy with counsel for William Morris-CAA. Between May and November 2012, Rowe continued prosecution of his Rule 60 motion by continuing to publicize his allegations of fraud and corruption and by soliciting members of the public to write to Judge Patterson asking him to re-open the Civil Rights Action. Scores of such letters were sent to Judge Patterson, most of which were filed under seal, apparently to protect the identity of the authors. *See* Docs. 780 through 848 in the Civil Rights Action.

136.   On November 8, 2012, Judge Patterson denied Rowe's Rule 60 motion.

137.   During 2012 and 2013, Washington continued to prosecute his employment discrimination arbitration against William Morris on a pro se basis. Washington had submitted Exhibit 31 in support of his claims and the arbitrator, recognizing that Exhibit 31 was potentially relevant to Washington's racial discrimination claims, asked Washington to submit additional information regarding Exhibit 31. During June 2013, Washington conducted a careful review of the court file in the Civil Rights Action in an attempt to discover such additional information.

138.   During that review, Washington discovered letters between the SNR

58

Lawyers and counsel for William Morris in the fall of 2002 regarding the results of EED's email searches. Those letters confirm that the SNR Lawyers allowed EED to produce the resulting emails to William Morris-CAA rather than to counsel for the Civil Rights Plaintiffs as was required under the court-ordered Email Discovery Protocol.

139.   Washington produced those letters to Rowe in June 2013. Those letters disclosed to Rowe and the other Civil Rights Plaintiffs for the first time that the SNR Lawyers had waived the right of first review of the email searches as provided under the court-ordered Email Discovery Protocol, which they considered further confirmation of a corrupt conspiracy with counsel for William Morris-CAA. In late July or August, 2013, Washington advised Rowe that with the exception of the partially incomplete Exhibit 31, he could not locate the Gary Lawyers' papers in opposition to William Morris-CAA's motions for summary judgment in the court file. By then, the arbitrator in Washington's case had also compelled William Morris to produce the emails identified on Exhibit 31.

140.   On September 9, 2013, Rowe wrote Judge Patterson an email asserting that Judge Patterson must be aware of "the fraud, collusion, and criminal activity that took place in my case" and reporting on the status of Rowe's and Washington's investigation into that fraud and collusion. Rowe informed Judge Patterson:

59

After Mr. Washington spent many days going through the
record at the SDNY, he informed me that the opposition to the
Defendants summary judgment motion submitted by my former
attorneys is now mysteriously missing. I am requesting an
investigation to find out why it is missing and to have it put
back in the record. This is an extremely important document in
my case and without it the record is not preserved. I also
request that you allow this evidence to become a part of my
case record to assist me in my future fight for justice.

141.   Also in September 2013, Rowe contacted FBI headquarters in
Washington D.C. and spoke to Patrick Bohrer, Special Agent in charge of public
corruption. Special Agent Bohrer arranged a meeting with FBI agents investigating
public corruption that Rowe attended in or about October 2013 in Washington.
Shortly after that meeting, Rowe met with FBI agents in Atlanta. Rowe asked the
FBI for assistance in investigating what Rowe believed was a corrupt conspiracy
between Judge Patterson, the SNR Lawyers, and counsel for William Morris-CAA
to assure that the Civil Rights Action was dismissed.

142.   In November 2013, Rowe sent letters to the SNR Lawyers and counsel
for William Morris informing them that he intended to file commercial liens against
them for hundreds of millions of dollars in damages caused by their alleged fraud,
corruption, and conspiracy with counsel for William Morris-CAA. In response,
counsel for William Morris and the SNR Lawyers filed applications in the Civil
Rights Action for an injunction barring Rowe from filing the commercial liens.

60

143.   On December 6, 2013, Judge Patterson issued a permanent injunction prohibiting Rowe from filing commercial liens against the SNR Lawyers, William Morris, or counsel to William Morris.

144.   On December 17, 2013, the arbitrator in Washington's case against William Morris issued a partial final judgment in favor of Washington, in part based on William Morris' failure to produce the racially derogatory emails identified on Exhibit 31.

145.   On January 8, 2014, Rowe sent a letter to Judge Patterson enclosing commercial liens that he intended to file against the SNR Lawyers and counsel for William Morris notwithstanding the permanent injunction. Rowe explained:

> As you may well know by now, arbitrator David L. Gregory of The American Arbitration Association has issued a partial final ruling in the Marcus Washington v. The William Morris Agency discrimination case.   He ruled that Mr. Washington had indeed been discriminated against by the William Morris Agency on the basis of his race. . . . The ironic factor in his decision is that it was largely based in part on the evidence that was obtained from, and cited in my case, Rowe Entertainment v. The William Morris Agency, but you sir, for some reason decided to overlook this evidence and not allow a jury to view it, denying me the basic right of all Americans – the right to a trial by jury.

146.   The SNR Lawyers and counsel for William Morris thereafter filed a motion for contempt against Rowe for violating the December 6, 2013 permanent

61

injunction. A hearing on that motion was held on January 24, 2014 at which Rowe participated by telephone. By that time, Judge Patterson had concluded that Rowe did not understand that the Gary Lawyers were responsible for failing to obtain the racially derogatory emails and for filing an altered version of E-Discovery Memorandum, even though they must have known that the memorandum was inadmissible.

147.    Accordingly, at the January 24, 2014 hearing, Judge Patterson had the following exchange with Rowe:

> Judge:    . . . this is something I think that you didn't fully understand, and continue not to understand fully, that [the E-Discovery Memorandum] is not a document that was prepared by any of the defendants [in the Civil Rights Action]. It was prepared by [your] electronic discovery company . . . So you don't know anything [about the underlying emails] from [the E-Discovery Memorandum].
>
> Rowe:    You know, Judge Patterson, you're right. You're 100 percent correct. But that's easy for you to prove. You could have said, come forth with the [emails] so we can see. . . .
>
> Judge:    Look, but that isn't my job. *That's up to the attorneys' to do. . . And your lawyer was the Gary firm. They had the power to do that.* Now it wasn't the responsibility of the lawyers here [the SNR Lawyers] . . . *So the fault, if any, lies with the Gary firm.*

Transcript of January 24, 2014 hearing before Judge Patterson, 8:18-22, 9:6, 9:9-12, 9:21 – 10:5 (emphasis added).

62

148.   Based on this exchange, Rowe concluded that Gary must have lied and that the Gary Lawyers were, in fact, part of the corrupt conspiracy with the SNR Lawyers and counsel for William Morris. Rowe filed commercial liens against Gary in February 2014. Notably, Judge Patterson denied Gary's request to enjoin Rowe from filing commercial liens against him and his firm. Thus, while Gary's fraud and misrepresentation prevented the Civil Rights Plaintiffs from discovering the Gary Lawyers' malpractice for years, Rowe's due diligence ultimately led to its discovery by late January 2014. A timeline of Rowe's due diligence is annexed hereto as Exhibit C.

149.   After Judge Patterson issued a contempt order requiring Rowe to withdraw the liens against the SNR Lawyers and counsel for William Morris, Rowe refused to comply. He was arrested at gun point by U.S. Marshals on April 9, 2014 and spent almost the next four months in jail in protest for what he considered a corrupt and fraudulent judiciary system. By August 1, 2014, medical issues forced Rowe to comply with Judge Patterson's contempt order and he was released from jail.

## IV.   PLAINTIFFS' FEDERAL RICO ACTION AGAINST THE GARY LAWYERS.

150.   On March 13, 2015, Rowe commenced a civil action in the United

63

States District Court for the Northern District of Georgia (the "Georgia Court")
asserting a federal claim against the Gary Lawyers and two former partners of the
Gary Firm who resided in Georgia (collectively, the "RICO Defendants"). The
action also asserted state law claims under Georgia state RICO, legal malpractice,
fraud, and unjust enrichment, *Rowe Entertainment, et al., v. Gary, et al.*, Civil
Action No. 1:15-CV-00770-AT (the "RICO Action").

151.   The premise of the RICO Action was that the only plausible
explanation for the Gary's gross malpractice in failing to obtain the racially
derogatory emails identified on the E-Discovery Memorandum was that he
engaged in a conspiracy with William Morris-CAA to conceal the emails in return
for a bribe or some type of other consideration.

152.   In the RICO Action, Rowe asserted that the bribery accusation was
also supported by Gary's track record of defrauding other clients, including a
Michigan gender discrimination case against Ford in which Gary defrauded his
clients out of $51.5 million of a 67.5 million settlement. Although Gary concealed
the actual settlement amount from his clients, his local Michigan counsel
inadvertently disclosed a spreadsheet setting forth the actual settlement amount to
one of the clients. The clients then sued Gary for fraudulently stealing $51.5
million of the settlement.

153.   Gary defended against the Michigan allegations by asserting that they were implausible. After examining some of Gary's emails in camera, however, the Michigan court granted the plaintiffs' motion to compel, finding:

> *There is probable cause to believe that a fraud has been attempted or committed* and that the [allegedly privileged] communications at issue were made in furtherance of it.

Opinion and Order Granting Plaintiffs' Motion for Order Compelling Discovery dated February 17, 2005, *Kubik v. Willie Gary, et al.*, Civil Action No. 03-CV-73350-DT (E.D. Mich.) at 9 (emphasis added).

154.   The Michigan court also determined that Gary may regularly engage in fraud against his clients and that otherwise privileged emails had to be produced under the crime/fraud exception to the attorney-client privilege:

> [The Gary Firm] may have used a common fraudulent settlement agreement scheme *in a variety of cases*, and that discussions [among the Gary Lawyers] about *the prospective structure of this scheme may have involved advice in furtherance of fraud*.

*Id*. at 8 (emphasis added).

155.   After that decision, Gary settled the Michigan case for an undisclosed amount and most of the relevant documents have been sealed.

156.   After Rowe filed the RICO Action, the Gary Lawyers moved to dismiss on two grounds, the claims were time barred and the bribery allegation was

implausible. On March 31, 2016, the Georgia Court granted the motion to dismiss the RICO Action on plausibility grounds. Significantly, the court rejected the Gary Lawyers' assertion that the claims were time-barred, finding that the RICO complaint's "allegations as bolstered with the Due Diligence Timetable [a revised version of which is annexed hereto as Exhibit C] may arguably demonstrate that Rowe acted with reasonable diligence in investigating his injury." Order dated March 31, 2016 [Doc. 71 in the RICO Action] at 30.

157.   Because two of the RICO Defendants were Georgia citizens, the Georgia Court lacked diversity jurisdiction over the RICO Action. When the federal RICO claim was dismissed, there was no other basis for jurisdiction over the state claims. The Georgia Court declined to exercise supplemental jurisdiction over the state claims, which were dismissed without prejudice. *Id*. at 64.

## V.   PLAINTIFFS' GEORGIA MALPRACTICE ACTION AGAINST THE GARY LAWYERS.

158.   On May 8, 2016, Rowe filed a diversity action in the Georgia Court asserting state claims of malpractice and fraud against only the Gary Lawyers, without naming the two Georgia residents as defendants. The Gary Lawyers subsequently moved to dismiss that action based on lack of personal jurisdiction and the Georgia Court granted that motion on November 29, 2016.

66

159.    Rowe has appealed the dismissal of the Georgia Malpractice Action and has filed a Rule 62.1 motion with the Georgia Court seeking an indicative ruling that the Georgia Malpractice Action be reinstated and transferred to this Court under 28 U.S.C. § 1631(a). In the meantime, Rowe has commenced this action in order to stop the statute of limitations from running in the event that the Rule 62.1 motion and pending appeal do not result in the transfer of the Georgia Malpractice Action to this Court. If the Georgia Malpractice Action is transferred, Rowe intends to voluntarily dismiss this action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Legal Malpractice – Breach of Contract)

160.    Plaintiffs Rowe and King re-allege and incorporate by reference each of the foregoing paragraphs as if set forth in full.

161.    On June 19, 2001, Rowe and King entered into the Retainer Agreement with the Gary Lawyers annexed hereto as Exhibit A (the "Retainer Agreement").

162.    Under the Retainer Agreement, the Civil Rights Plaintiffs, including Rowe and King, entrusted the Gary Lawyers with representing the Civil Rights Plaintiffs' interests in the Civil Rights Action.

163.    Under the Retainer Agreement, the Gary Lawyers agreed to represent

67

the Civil Rights Plaintiffs in the Civil Rights Action.

164.   The Retainer Agreement gave rise to an attorney-client relationship between the Civil Rights Plaintiffs, including Rowe and King, and the Gary Lawyers, which existed from before June 19, 2001 through October 2, 2006.

165.   The Gary Lawyers owed a duty under the Retainer Agreement to represent the Civil Rights Plaintiffs with ordinary care, skill, and diligence in accordance with the accepted standards of professional service and competence expected of lawyers representing clients in major civil rights litigation.

166.   The Gary Lawyers breached their duty under the Retainer Agreement by failing to exercise the ordinary care, skill, and diligence in accordance with the accepted standards of professional service and competence expected of lawyers representing clients in major civil rights litigation.

167.   The Gary Lawyers owed a fiduciary duty under the Retainer Agreement to place the Civil Rights Plaintiffs' interests over the Gary Lawyers' own interests.

168.   The Gary Lawyers breached their fiduciary duty under the Retainer Agreement by placing their own interests over the Civil Rights Plaintiffs' interests.

169.   The Gary Defendants breached their fiduciary duty and their duty of ordinary care, skill, and diligence under the Retainer Agreement by, *inter alia*,

68

engaging in the following conduct:

(i)     failing to obtain the racially derogatory emails identified on the E-Discovery Memorandum;

(ii)    failing to instruct EED to search for emails of the list of agents in the music departments of William Morris and CAA that the Civil Rights Plaintiffs provided;

(iii)   allowing William Morris-CAA to violate the Email Discovery Protocol by instructing EED to send the initial email search results to William Morris-CAA's counsel rather than to the Civil Rights Plaintiffs' counsel as required by that protocol;

(iv)    failing to respond competently to William Morris-CAA's motions to exclude the Civil Rights Plaintiffs' experts;

(v)     advising the Civil Rights Plaintiffs to reject William Morris-CAA's $20 million settlement offer without seriously considering that offer or the potential risks that William Morris-CAA's motions for summary judgment might be granted;

(vi)    falsely representing that the E-Discovery Memorandum was the "smoking gun" that guaranteed denial of the motions for summary judgment and a verdict or settlement of $ 1 billion or more;

(vii)   mistakenly believing that in order to prevail on the motions for summary judgment, William Morris-CAA had the burden of proving the lack of evidence to raise a question of fact;

(viii)  filing an altered version of the E-Discovery Memorandum as Exhibit 31 in opposition to the motions for summary judgment;

69

(ix)   failing to submit other documents, testimony, and evidence supporting the Civil Rights Plaintiffs' claims in admissible form to oppose William Morris-CAA's motions for summary judgment;

(x)   repeatedly submitting summary judgment opposition papers that violated applicable court rules and the rules of evidence;

(xi)   repeatedly concealing material developments in the Civil Rights Action from the Civil Rights Plaintiffs; and

(xii)   misrepresenting and omitting material developments in the Civil Rights Action to the Civil Rights Plaintiffs.

170.   These breaches of the Gary Lawyers' fiduciary and professional duties caused injury to Rowe and King, including, but not limited to:

(i)   the Civil Rights Plaintiffs' rejection of William Morris-CAA's $20 million settlement offer;

(ii)   dismissal of the Civil Rights Action, which would have resulted in a settlement or jury award of at least $1 billion by Gary's own estimate but for the Gary Lawyers' breach of duty;

(iii)   effectively ending Rowe's and King's businesses as concert promoters;

(iv)   damages to Rowe's and King's reputation; and

(v)   hundreds of thousands of dollars in expenses in the Civil Rights Action, including the $200,000 fee paid to EED for email searches, $230,000 paid for appellate legal fees and expenses, and $20,000 for every trip Gary made to New York on his private jet.

171.   This legal malpractice claim is timely because (i) the Gary Lawyer's fraud in misrepresenting the cause of the dismissal of the Civil Rights Action set forth, *supra*, at ¶¶ 91-106, debarred and deterred Rowe and King from bringing this legal malpractice claim; and (ii) Rowe and King did not discover the Gary Lawyer's fraud in misrepresenting the cause of the dismissal of the Civil Rights Action, despite their due diligence, until on or after Rowe's exchange with Judge Patterson at the January 24, 2014 hearing in the Civil Rights Action.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Inducement)

172.   Rowe and King re-allege and incorporate by reference each of the foregoing paragraphs as if set forth in full.

173.   In a telephone call on or about November or December 2002, Willie Gary told Rowe that he should reject that a $20 million settlement offer from William Morris-CAA as set forth in more detail, *supra*, at ¶¶ 68-69.

174.   In that telephone call, Gary told Rowe that the E-Discovery Memorandum was the "smoking gun" that would guarantee that William Morris-CAA's summary judgment motion and that the Civil Rights Action would result in a settlement or verdict of at least $1 billion dollars.

175.   Gary knew, however, that the E-Discovery Memorandum was

inadmissible and that he had failed to obtain the racially derogatory emails identified on that memorandum.

176.   Gary's representation that the E-Discovery Memorandum guaranteed that the summary judgment motions would be dismissed and that the Civil Rights Action would result in a settlement or verdict of at least $1 billion was false.

177.   When Gary told Rowe that the E-Discovery Memorandum and the racially derogatory emails identified on that memorandum constituted "smoking guns" that guaranteed that the summary judgment motions would be dismissed and that the Civil Rights Action would result in a settlement or verdict of at least $1 billion, Gary knew that representation was false.

178.   When Gary made those fraudulent representations, he fraudulently omitted two critical facts: (i) he and the other Gary Lawyers never obtained the racially derogatory emails; and (ii) the E-Discovery Memorandum was inadmissible.

179.   Gary made those fraudulent misrepresentations and omissions in order to induce Rowe and the other Civil Rights Plaintiffs into rejecting William Morris-CAA's settlement offer of $20 million.

180.   In reasonable reliance on Gary's misrepresentations and omissions, Rowe and the other Civil Rights Plaintiffs rejected William Morris-CAA's $20 million settlement offer.

181.   The other Gary Lawyers were aware of Gary's fraudulent misrepresentations and omissions made to the Civil Rights Plaintiffs in order to induce them to reject William Morris-CAA's $20 million settlement offer. Gary made those fraudulent misrepresentations and omissions on behalf of the other Gary Lawyers, with their consent and approval.

182.   As a direct, proximate, and foreseeable result of Gary's false representations, Rowe and King have been injured by their rejection of the $20 million settlement offer made by William Morris-CAA in November or December 2002.

183.   This fraudulent inducement claim is timely because (i) the Gary Lawyer's fraud in misrepresenting the cause of the dismissal of the Civil Rights Action set forth, *supra*, at ¶¶ 91-106, debarred and deterred Rowe and King from bringing this fraudulent inducement claim; and (ii) Rowe and King did not discover the Gary Lawyer's fraud in misrepresenting the cause of the dismissal of the Civil Rights Action, despite their due diligence, until on or after Rowe's exchange with Judge Patterson at the January 24, 2014 hearing in the Civil Rights Action.

## JURY DEMAND

184.   Plaintiffs demand a jury on all issues that may be tried by jury.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand judgment as follows:

**On the First Claim for Relief:**

185.   An award of compensatory damages of at least $20 million according to proof at trial plus pre-judgment interest.

**On the Second Claim for Relief:**

186.   An award of (i) compensatory damages of at least $20 million according to proof at trial plus pre-judgment interest; and (ii) punitive damages in an amount to be proven at trial.

**As to All Claims for Relief:**

187.   For such other legal and equitable relief as the Court may deem Rowe and King are entitled to receive.

Dated:   January 3, 2016

THE GRIFFITH FIRM

*/s/ Edward Griffith*
By:_____
        EDWARD GRIFFITH, ESQ.
45 Broadway, Suite 2200
New York, New York   10006
(212) 363-3784
(212) 363-3790 (fax)

*Counsel for Plaintiffs Leonard Rowe,*
*Rowe Entertainment, Inc., Lee King,*
*and Lee King Productions, Inc.*